

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Railroad Commission of Texas
Austin, Texas

Gentlemen:

Opinion No. 0-4540
Re: Whether the Railroad Commis-
sion has jurisdiction of the
described operations, under
Article 911a, Vernon's Anno-
tated Civil Statutes

    We have carefully considered your request of April 10, 1942, which reads as follows:

    "We, the undersigned Railroad Commissioners of Texas, do hereby present to you the following factual situation and request for your legal opinion grounded thereon:

    "The Great Western Sugar Company and some eight other sugar companies are engaged in the enterprise of procuring labor, mostly Mexican, in Texas and are transporting such laborers, direct-ly or indirectly, over the highways of Texas, in interstate commerce, to the States of Colorado, Michigan, Indiana, Ohio, Montana, and possibly other states.

    "The persons carrying these laborers are do-ing so, in part at least, by motor vehicle; and our problem is whether or not we have the author-ity and jurisdiction to stop these motor vehicle movements which are being carried on by persons holding no authority from this Commission to use the highways of Texas in interstate commerce for the transportation of persons for hire under the Motor Bus Law of Texas.

    "With more particularity, the facts are now given to you as follows:

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

"The Gephart Employment Agency, of San Antonio, Texas, is a licensed immigrant labor agent with the Labor Board of the State of Texas and is presently operating under Certificate No. 16 issued to it by the State Labor Board. Gephart has approximately 30 agents or employes, working in the Counties of Dallas, Dimmit, Hidalgo, Maverick, Nueces, Val Verde, Webb, Zavalla, El Paso, and La Salle, engaged in the solicitation of immigrant labor for the Great Western Sugar Company of Denver, Colorado. Each of said agents are paid a salary for their work by the Gephart Employment Agency.

"A particular agent of the Gephart Employment Agency will, for example, contact a number of Mexican laborers in Mercedes; and, if the Mexican laborers are agreeable to go to the sugar beet fields in one of the previously named states, said agent will give said laborers the right to go by their own private vehicle to San Antonio, or the Gephart Employment agency will pay the transportation cost of transporting said laborers over a duly authorized passenger carrier from Mercedes to San Antonio.

"In the event the laborer does not move over a duly authorized carrier from Mercedes to San Antonio, you are to assume that he moves by a private vehicle and that there is no compensation or for hire element involved,--the vehicle in each such instance belonging to some one of the laborers making the trip.

"When said laborers have reached the Gephart Employment Agency in San Antonio they are classified as to the points and localities in which they desire to engage in the sugar beet work.

"Thereafter, Gephart Employment Agency will permit the head of a family, who is the owner of a passenger vehicle or motor truck of which he is then and there the lawful owner and the holder of the certificate of title to said vehicle, to transport himself and the members of his family from San Antonio, Texas to some one point in one of the above

named states. The owner of the vehicle, as well as the members of his family, will, upon reaching their destination, all go to work in one of the sugar beet fields in said locality;and, for the purposes of this opinion, they will not return to the State of Texas. For such transportation the Gephart Employment Agency pays the owner of the vehicle $10.00 for each member of his family over the age of 14 years that was transported in said vehicle,--which said amount is claimed to be for the expense of the trip. In each instance only one trip is made by a particular owner of the vehicle and he only transports himself and the members of the family of which he is the head.

"For the work done by these persons after reaching their destination they are paid so much per acre over a given definite period of time at the end of which they are paid a bonus; and, thereafter, they are free to go where they like.

## "First

"Gephart Labor Agency, the trade name for Jose Gephart, having no authority from this Commission of any kind, you are requested to give us your opinion as to whether or not this Commission can stop him either by injunction or by criminal prosecution.

## "Second

"Great Western Sugar Company, a foreign corporation, having no authority from this Commission of any kind to transport passengers for hire, does this Commission have the jurisdiction to proceed against it or its agents either by criminal prosecution or by injunctive proceedings?

## "Third

"The head of the family, having no authority of any kind from this Commission to transport passengers for hire, does this Commission have jurisdiction to proceed against him either by criminal prosecution or by injunctive proceedings?

Railroad Commission of Texas, page 4

"If, and in the event, your answer to one or more of the above questions is in the affirmative, then please submit to us a formal complaint or indictment charging said person with a violation of Article 911a, Vernon's Annotated Civil Statutes, which said indictment or complaint would in your opinion, withstand a legal test before the courts of this state.

"In addition to the activities of the Gephart Employment Agency, there is also located at San Antonio, Texas, a labor agency owned and operated by S. P. Acosta and operated under the trade name of Acosta Labor Agency. This particular agency is likewise engaged in the business of soliciting and procuring immigrant laborers, mostly Mexican, for the sugar fields located in the previously mentioned states.

"The plan of operation of the Acosta Labor Agency is somewhat different from that of the Gephart Employment Agency.

"The Acosta Labor Agency has some 300 agents employed in different counties within the State of Texas who are engaged in the business of soliciting and procuring immigrant laborers for the sugar beet companies located in the above named states. These agents do not receive a specified salary for their services but are paid on the basis of the number of laborers which they procure and deliver,-- the per capita rate being $1.00 per head, $2.00 per head, or $2.50 per head, depending on the distance from the point of procurement to San Antonio. Unlike the Gephart Employment Agency, the procurement agents for Acosta, at the several points of procurement, inform persons procured by them at points of procurement just what their destination is to be; and these laborers know where they are going before they ever leave home.

"When a particular agent contacts and procures a given number of laborers in any one locality, he will transport said laborers in his own car to San Antonio, Texas; and, for such services, he will receive $1.00, $2.00, or $2.50, depending upon the distance actually traveled to San Antonio; and he will make only one trip.

Railroad Commission of Texas, page 5

"After the laborers reach San Antonio they are classified and examined and are subsequently transported to some point in one of the above named States in the following manner:

"The Acosta Labor Agency will take the vehicle owned by one member of the group to be transported,--and of which vehicle said man is then and there the legal owner,-- and will pay to said laborer owning said vehicle $10.00 for each member of the family of which he is the head moving on said vehicle, which said amount is designated as travel expenses. If, in addition to the members of the driver's family, there are other laborers moving in the same vehicle, they move free.

"In order that our statement may be perfectly clear to you, we give you the following example:

"In the event a particular laborer is the owner of a vehicle and is also the head of a family of seven, the Acosta Labor Agency will pay to said owner and laborer $80.00 as expense for transportation; and, at the same time, if there are four additional laborers to move in the same vehicle, no allowance will be made for said four additional laborers.

"In connection with the foregoing, in some instances the agent who carries the laborers, for instance, from Pearsall to San Antonio will go on through to the particular fields in the foreign state and will remain there as a worker. In other instances he will go back to Pearsall with his car but he does not make another trip in that car from Pearsall to San Antonio with another group. In instances where he goes back to Pearsall after having made one trip, he then busies himself congregating another family owning a car. In this latter kind of a case he requires that the family go to San Antonio in their own car without compensation; but he, the agent, in that instance gets the $1.00, or $2.00, or $2.50 per head, or divides such charge with the member of the family who owns the car and who carried the people to San Antonio.

Railroad Commission of Texas, page 6

"None of the persons involved in this enter-
prise have any authority from this Commission to
carry passengers for hire.

"You are asked the following questions on the
latter facts:

### "First

"Does this Commission have the jurisdiction
to proceed against Acosta Labor Agency either by
criminal proceedings or by injunctive proceedings?

### "Second

"Does this Commission have the jurisdiction
to proceed against the eight sugar companies for
whose benefit these activities are carried on, or
against their agents, by criminal proceedings or
by injunctive proceedings?

### "Third

"Does this Commission have the jurisdiction,
either by criminal proceedings or by injunctive
proceedings, to proceed against these some three
hundred procurement agents?

"We make the same request with respect to a
complaint or bill of indictment in the event you
should answer any of the foregoing questions in the
affirmative which we made above with respect to
Gephart.

"In connection with all of the above and fore-
going, we most respectfully call your attention to
the definition of a motor bus company as the same
is found in Section 1 (c) and Section 2 of Article
911a, Vernon's Annotated Civil Statutes, and to the
case of Hoffman vs State, 20 S. W. (2d) 1057, de-
cided by the Court of Criminal Appeals, October 16,
1929.

"This Commission is being vigorously pressed
with this matter both by those who claim we have

jurisdiction and those who claim we have no jurisdiction; and you are urgently requested to give us your opinion as urgently as possible."

We construe your questions to relate, of course, only to your authority in the premises under Article 911a, Vernon's Annotated Civil Statutes, the motor bus law of Texas.

The following facts exist in each situation you have described:

(1) Each motor vehicle makes but one transportation trip;

(2) The motor vehicle is privately owned by the driver in each instance;

(3) The passengers in the first case described are members of the owners family only; in the second case, members of the family, and, if others, transportation is without charge as to them;

(4) No passenger in any motor vehicle pays compensation to any one;

(5) When transportation is by any method except by a particular vehicle driven by its owner, such transportation is by a duly authorized passenger carrier.

We must decide if these operations constitute motor bus company operations within the purview of subsection (c) of section 1 of Article 911a, V. A. C. S., wherefore such operations may not be engaged in, under section 2 of Article 911a, except in accordance with the provisions of Article 911a.

A motor bus company was originally defined (Acts, 40th Legislature, 1927, Chapter 270, page 399, section 1) as follows:

"The term 'Motor Bus Company' when used in this Act means every corporation or person as herein defined, their lessees, trustees, receivers, or trustees appointed by any court whatsoever, owning, controlling, operating or managing

any motor propelled passenger vehicle, not usual-
ly operated on or over rails, and engaged regular-
ly in the business of transporting persons as
passengers for compensation or hire over the pub-
lic highways between points within the State of
Texas, whether operating over fixed routes or
otherwise. . . ." (Emphasis ours)

Section 2 of this original act provided:

"All motor bus companies, as defined herein,
are hereby declared to be 'common carriers' and
subject to regulation by the State of Texas, and
shall not operate any motor propelled passenger
vehicle for the regular transportation of persons
as passengers for compensation or hire over any
public highway in this State except in accord-
ance with the provisions of this Act. . . ."
(Emphasis ours)

The definition was amended by the 41st Legislature
(Acts 41st Legislature, 1929, Chapter 78, page 196, 1st C.S.)
to read as follows:

"The term 'Motor Bus Company' when used in
this Act means every corporation or persons as
herein defined, their lessees, trustees, receiv-
ers, or trustees appointed by any court whatso-
ever, owning, controlling, operating or managing
any motor propelled passenger vehicle not usually
operated on or over rails, and engaged in the
business of transporting persons for compensa-
tion or hire over the public highways within the
State of Texas, whether operating over fixed routes
or fixed schedules, or otherwise; . . ." (Emphasis
ours)

It is observed that the word "regularly" was omitted
from the definition and the words "or fixed schedules" were add-
ed. Section 2 of the original act, containing the words "for
the regular transportation of persons," was left unchanged.

The case of Hoffman v. State, 20 S. W. (2d) 1057, by
the Court of Criminal Appeals of Texas, arose under the original

Act.  Upon the question of a single transportation of passengers, the court said:

> "This law is not violated by an agent of such company, who hires a service car one time to transport over a public highway of this state passengers who had been brought to our state line upon a vehicle operated outside the state by said company.  This is what appears from the statement of facts to have been done by appellant.  This seems to be all that he is shown by proof to have done.  Unless under the facts the vehicle in question was operated on the public highways of this state regularly for the transportation of such passengers without a permit, its operator would not violate the law. . . ."

The case of Commercial Credit Company v. Groseclose, 66 S. W. (2d) 709, (writ dismissed), arose subsequent to the amendatory act.  As pertinent here, the case involved a fact situation where one Morrison was driving an automobile, belonging to Commercial Credit Company, from Los Angeles, California, to Dallas, Texas.  At El Paso he agreed to transport Groseclose to Big Spring, Texas, for the sum of $4.00.  In deciding that neither Morrison nor Commercial Credit Company were engaged in the business of transporting persons for compensation or hire upon the highways of this State, the court cited the Hoffman case, supra, with approval, saying:

> "Morrison was simply engaged in the task of driving a passenger car to Dallas to be there delivered to appellant, under a contract so to do. Neither Morrison nor appellant violated either of the laws mentioned (the motor carrier law and the motor bus law) in undertaking to transport plaintiff for hire from El Paso to Big Spring.  Hoffman v. State, (Tex. Crim. App.) 20 S. W. (2d) 1057."

It is obvious that the court in the latter case did not regard the elimination from the definition of the word "regular," by the 1929 amendment, as changing the rule of the Hoffman case regarding a single transportation of passengers transaction.

It is observed that the 1927 definition contains the language "whether operating over fixed routes or otherwise," whereas the 1929 definition reads "whether operating over fixed routes or fixed schedules, or otherwise." The legislative purpose is manifest. It was that the absence of fixed schedules should not remove an operator from the motor bus company definition, and explains the elimination of the word "regular" simultaneously with the addition of the words "fixed schedules."

The failure of the 41st Legislature in 1929 to amend section 2 of the 1927 act containing the language "for the regular transportation of persons" evinces a legislative intent that the elimination of the word "regularly" in the motor bus company definition was not intended to completely remove the requirement of some regularity or continuity in the carrying of passengers for hire.

It is clear, moreover, that the language "engaged in the business of," contained in the present motor bus company definition, denotes something in addition to one isolated and incidental transaction. In Webster's New International Dictionary the word "business" is defined as follows:

"That which busies or engages time, attention or labor, as a principle serious concern or interest. Specifically: a. constant employment; regular occupation; work. . . b. any particular occupation or employment habitually engaged in, especially, for livlihood or gain. . . . "

It is unnecessary for us to explore the full meaning intended by the phrase "engaged in the business of." Suffice it to say that in our opinion it does not embrace or include a single incidental and isolated transaction where persons are transported as under each of the situations described in your letter.

It would seem, furthermore, that the additional element of "compensation or hire" is not present under the described facts.

Each of your questions is accordingly answered in the negative.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By _____
Zollie C. Steakley
Assistant

ZCS:db